UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| DANIEL STEININGER, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | |
| v. | ) ) | CAUSE NO. 1:07-CV-00278 |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) ) ) ) | |
| Defendant. | ) ) | |

## OPINION AND ORDER

Plaintiff Daniel Steininger appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for a period of disability, Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI").[1] (*See* Docket # 1.) For the following reasons, the Commissioner's decision will be REVERSED, and the case will be REMANDED to the Commissioner for further proceedings in accordance with this Opinion.

### I. PROCEDURAL HISTORY

Steininger applied for DIB and SSI on December 30, 2003, alleging that he became disabled as of March 1, 2003. (Tr. 39-40.) The Commissioner denied his application initially and upon reconsideration, and Steininger requested an administrative hearing. (Tr. 33-34.) A hearing was conducted by Administrative Law Judge (ALJ) Terry Miller on December 14, 2006,

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

at which Steininger, who appeared *pro se*, and a vocational expert ("VE") testified. (Tr. 462-523.)

On February 21, 2007, the ALJ rendered an unfavorable decision to Steininger, concluding that he was not disabled because he could perform a significant number of jobs in the national economy despite the limitations caused by his impairments. (Tr. 14-27.) Steininger then retained an attorney to represent him on an appeal to the Appeals Council; the appeal was later denied, making the ALJ's decision the final decision of the Commissioner. (Tr. 5-13, 457-61.) Steininger filed a complaint with this Court on November 7, 2007, seeking relief from the Commissioner's final decision. (Docket # 1.)

## II. STEININGER'S ARGUMENTS

Steininger alleges two flaws with the Commissioner's final decision. Specifically, Steininger claims that (1) the ALJ failed to incorporate into the RFC all of the mental limitations he found in the application of the psychiatric review technique, and (2) the ALJ failed to obtain a valid waiver of representation from him and did not adequately develop the record. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 10-11.)

## III. FACTUAL BACKGROUND[2]

### *A. Background*

At the time of the ALJ's decision, Steininger was fifty-one years old; had a bachelor's degree in education; and possessed work experience as a roofer, fork lift operator, order processor, high school teacher, and production worker. (Tr. 25, 39, 48, 58, 61, 111, 471-72.) Steininger alleges that he became disabled as of March 1, 2003, due to the following ailments: a

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 523-page administrative record necessary to the decision.

history of discitis infection and degenerative disc disease of the lumbar spine with back pain and lumbar radiculitis; piriformis syndrome with secondary sciatica; bilateral carpal tunnel syndrome; left inguinal hernia repair; a history of gout; a history of glaucoma and right eye blindness; a depressive disorder, a pain disorder, and a personality disorder, not otherwise specified; and a history of alcohol abuse and dependence, cocaine abuse, and IV drug abuse. (Opening Br. 2.) Steininger "does not challenge the findings of the ALJ in regard to his physical problems but only the mental ones." (Opening Br. 2 n.1.) Therefore, we will focus on the evidence pertaining to Steininger's mental limitations.

At the hearing, Steininger explained that he lives by himself in a small house; performs his self care independently; does his own laundry, cooking, and housekeeping; mows his own grass; and pays his bills. (Tr. 505-08.) Steininger explained that ever since he lost his driver's license due to being a habitual traffic violator, his bicycle is his main mode of transportation and he rides it several times a week. (Tr. 495, 506.) When asked to describe his typical day, Steininger explained that he watches television, eats meals, works crossword puzzles but does not finish them, rents videos, reads the newspaper, and naps. (Tr. 501A-504.)

Steininger further explained that he had a "nervous breakdown" in 1989. (Tr. 476.) He last worked part time in a liquor store in 2004 but stated that he could not physically or mentally do the job. (Tr. 473-74.) Steininger explained that his mind wanders, he loses focus and concentration, he sometimes rambles tangentially, and he has short term memory problems. (Tr. 496.) He elaborated that he does not like people because they make him nervous and that he usually cannot complete tasks due to distraction. (Tr. 499-500.) He stated that he is under the care of a psychiatrist, sees a counselor about twice a month, and takes medication for his mental

3

health issues. (Tr. 497-99.)

Steininger reported that he went through drug and alcohol rehabilitation in the early 1990s, which he deemed successful. (Tr. 501A.) He confided, however, that he drinks two to three beers two to three times a week though he does not drink to excess; nonetheless, he admitted that he was charged with public intoxication a year before the hearing. (Tr. 500-01.) Steininger also stated that in January 2006 he and a friend "did some drinking" and took "too many pills," and it was labeled a multi-drug overdose at Parkview Hospital. (Tr. 512.)

*B. Summary of the Relevant Medical Evidence*

On July 1, 2003, Dr. Sherwin Kepes performed a psychological evaluation at the request of vocational rehabilitation. (Tr. 135-39.) Dr. Kepes noted that Steininger appeared somewhat nervous and that he maintained little eye contact. (Tr. 137.) Dr. Kepes administered the MMPI, the results of which suggested that Steininger was an individual experiencing some degree of tenseness and subjective unhappiness. (Tr. 137.) Dr. Kepes reported that Steininger evidenced characterological difficulties that suggested some, but not clearly any one of several, personality disorders. (Tr. 138.) He suggested that Steininger "would be most comfortable working alone with a minimum of supervision" (Tr. 138.) He diagnosed Steininger with depressive disorder, NOS; pain disorder associated with a general medical condition, low back; and a personality disorder, NOS. (Tr. 138-39.)

While hospitalized in September 2003 for back problems, Steininger was seen by Dr. Frank Shao, a psychiatrist, due to complaints of "crazy thoughts." (Tr. 239.) He was diagnosed with cocaine dependence. (Tr. 238-39.)

Steininger was seen again on October 6, 2003, for his psychiatric problems. (Tr. 231.)

4

When asked whether he remembered Dr. Shao's recommendation that he be substance free for thirty days and then be evaluated for possible treatment with psychiatric medicines, Steininger reported that he did recall that, but that he was reluctant to commit to any kind of treatment. (Tr. 231.)

In January 2006, Steininger was hospitalized for a multiple drug overdose reflecting a mix of alcohol and prescription medications, and a positive urine screen for cocaine. (Tr. 383-93, 396.) He was diagnosed with polysubstance abuse, mood disorder secondary to polysubstance abuse, cluster B antisocial, and hypertension; he was referred to Park Center for outpatient follow-up care. (Tr. 391.)

In March 2006, Steininger was evaluated by Dr. Schneider at Psychiatric Care, Inc., upon referral from a mental health counselor at Comprehensive Behavior Services, Inc. (Tr. 451-55.) The mental status examination indicated some tenseness, psychomotor agitation, fidgeting, a racing flow of thought, mild paranoid thought content, loud and rambling speech, angry and helpless mood, flat affect, poor to fair insight, poor to fair judgment, and poor to fair capacity for daily living. (Tr. 454.) Steininger was diagnosed with alcohol dependence and rule out narcissistic traits. (Tr. 455.) He was assigned a current Global Assessment of Functioning (GAF) score of 35, with 40 as his highest GAF score in the preceding year.[3] (Tr. 455.)

In July 2006, Natalie Niswander, a social worker at Comprehensive Behavioral Services, Inc., penned a letter "to whom it may concern" indicating that Steininger was a client at that

---

[3] A GAF score is a clinician's judgment of an individual's overall level of psychological, social, and occupational functioning on a hypothetical continuum of mental health illness; the GAF excludes any physical or environmental limitations. *See* American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. 2000). A GAF score of 35 or 40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work). *Id*.

agency, that he was consistent in keeping weekly therapy appointments, and that she was assisting him to complete his application for disability. (Tr. 447.) She opined that Steininger's "serious mental problems preclude his being able to maintain regular employment" and invited the ALJ to contact her for additional information if it would be helpful, explaining that she would then ask Steininger to sign a consent to release the information to the ALJ. (Tr. 447.)

## IV. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## V. ANALYSIS

### *A. The Law*

Under the Act, a claimant is entitled to DIB or SSI if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[4] *See* 20 C.F.R. §§ 404.1520, 416.920; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the

---

[4] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

Commissioner. *Clifford*, 227 F.3d at 868.

## B. The ALJ's Decision

On February 21, 2007, the ALJ rendered his opinion. (Tr. 14-27.) He found at step one of the five-step analysis that Steininger had not engaged in substantial gainful activity since his alleged onset date. (Tr. 16.) At step two, the ALJ concluded that Steininger had numerous severe physical impairments and the following severe mental health impairments: depressive disorder, pain disorder, personality disorder, a history of alcohol abuse and dependence, and a history of cocaine and IV drug abuse. (Tr. 16.)

At step three, the ALJ determined that Steininger's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 17.) Before proceeding to step four, the ALJ determined that Steininger's testimony of debilitating limitations was "not fully credible" and that he had the following RFC:

> [T]he claimant has the residual functional capacity to perform "light" exertional level work . . . reduced as follows: an option to sit/stand where the claimant is allowed to sit occasionally throughout an 8 hour work day, but is still able to pay attention to the task at hand; occasional postural maneuvers; no climbing of ladders, ropes, or scaffolds; no forceful gripping or grasping of the hands; a limitation to work that would accommodate monocular vision with no job requiring constant close visual work or reading of fine printed materials; no work involving concentrated exposure to hazards, such as heights and moving machinery; and simple, routine, repetitive tasks with only occasional and brief interactions with others, but would work best if the claimant were allowed to work alone.

(Tr. 18.)

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Steininger was unable to perform any of his past relevant work. (Tr. 25.) The ALJ then concluded at step five that Steininger could perform a significant number of jobs within the

economy, including maid (450 jobs), mail sorter (450 jobs), small parts assembler (600 jobs), and electronic assembler (800 jobs). (Tr. 26.) Therefore, Steininger's claim for DIB and SSI was denied. (Tr. 27.)

### C. The ALJ Erred By Failing to Incorporate Into Steininger's RFC All of the Mental Limitations He Found in the Application of the Psychiatric Review Technique

Steininger argues that the ALJ failed to accurately reflect his findings regarding Steininger's mental limitations in the hypothetical that served as the basis for his step-five determination. (Opening Br. 11.) Steininger's argument ultimately has merit under Seventh Circuit case law and warrants a remand of the Commissioner's final decision.

To explain, in determining the severity of a claimant's mental impairment, the ALJ must address a claimant's degree of functional limitation in four "broad functional areas": activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3); *see, e.g.*, *Jones v. Massanari*, No. 01-C-0024-C, 2001 WL 34382025, at *13 (W.D. Wis. Oct. 18, 2001). The Seventh Circuit Court of Appeals has stated that the ALJ must then "incorporate" these limitations into the hypothetical questions posed to the VE at step five. *Kasarsky v. Barnhart*, 335 F.3d 539, 543-44 (7th Cir. 2003) (holding that the ALJ erred when neither his RFC nor his hypothetical question to the VE "[took] into account" his finding at step two that the claimant had deficiencies in concentration, persistence, or pace). Stated more broadly, "to the extent the ALJ relies on testimony from a vocational expert, the question posed to the expert must incorporate *all* relevant limitations from which the claimant suffers." *Id.* (emphasis added).

Here, at step three of his analysis, the ALJ found that Steininger had a moderate limitation in his ability to maintain concentration, persistence, or pace. (Tr. 17.) Yet, the

9

hypothetical question posed by the ALJ to the VE did not expressly incorporate this finding, instead limiting Steininger to "simple, routine, repetitive tasks with only occasional and brief interactions with others . . . ." (Tr. 18.) The Commissioner argues that the ALJ's limitation adequately accommodates Steininger's deficits in concentration. Steininger disagrees; he contends that the ALJ's failure to incorporate his moderate limitations in concentration, persistence, or pace into the hypothetical left the VE with an incomplete picture of his actual limitations.

"Courts have not reached a clear consensus regarding whether it is appropriate for an ALJ to phrase hypothetical questions about mental residual functional capacity in terms of the work a claimant can perform as opposed to providing a claimant's limitations and 'allowing the vocational expert to conclude on his own what types of work the plaintiff can perform.'" *O'Connor-Spinner v. Astrue*, No. 4:06-CV-0171-DFH-WGH, 2007 WL 4556741, at *7 (S.D. Ind. Dec. 20, 2007) (quoting *Kusilek v. Barnhart*, No. 04-C-310-C, 2005 WL 567816, at *4 (W.D. Wis. Mar. 2, 2005), *aff'd*, 175 Fed.Appx. 68 (7th Cir. 2006)). "[T]he central lesson in cases considering this issue appears to be that an ALJ is free to formulate his mental residual functional capacity assessment in terms such as 'able to perform simple, routine, repetitive work' so long as the record adequately supports that conclusion.'" *Id*. (quoting *Kusilek*, 2005 WL 56716, at *4 (internal quotation marks omitted)).

In that vein, courts have held that when a medical source of record translates his findings into a particular RFC assessment, the ALJ may reasonably rely on that opinion in formulating a hypothetical question for the VE. *Id*.; *see, e.g.*, *Johansen v. Barnhart*, 314 F.3d 283, 289 (7th Cir. 2002) (concluding that the ALJ's limitation to low-stress, repetitive work adequately

10

incorporated the claimant's moderate mental limitations because the consulting physician had essentially "translated [his] findings into a specific RFC assessment, concluding that [the claimant] could still perform low-stress, repetitive work."); *Howard v. Massanari*, 255 F.3d 577, 581-82 (8th Cir. 2001) (concluding that the ALJ adequately captured the claimant's deficiencies in concentration, persistence, or pace in his RFC that limited the claimant to simple, repetitive tasks, in part because the state agency psychologist concluded in his functional capacity assessment that the claimant could sustain sufficient concentration and attention to perform simple, repetitive, and routine activity); *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001) (finding that the ALJ's limitation of plaintiff to work that is "routine and low stress" as recommended by one medical source of record adequately accounted for the fact that plaintiff "often" suffers from deficiencies in "concentration, persistence, or pace").

This, however, is not a case where the ALJ relied upon a medical source's translation of Steininger's deficits in concentration, persistence, or pace to a specific RFC finding. To explain, Dr. Kepes never specifically addressed Steininger's ability to maintain concentration, persistence, or pace, simply opining that Steininger "would be most comfortable working alone with a minimum of supervision" (Tr. 138), and Dr. Schneider assigned Steininger a GAF score that in effect precludes *all* employment. In fact, medical evidence of record pertaining to Steininger's mental impairments is somewhat sparse, as no state agency physicians reviewed the record with respect to Steininger's mental health impairments (*see* Tr. 176-83), and no records were obtained from Dr. Pancer, Steininger's treating psychiatrist (*see infra* note 5).

Of course, it is possible that there is an explanation for the omission of the ALJ's finding with respect to Steininger's deficiencies in concentration, persistence, or pace in the hypothetical

11

posed to the VE. That is, perhaps the ALJ never meant to find that Steininger experiences any work-related limitation due to his moderate limitations in concentration, persistence, or pace. *See Kasarsky*, 335 F.3d at 544. Yet, we have no way of knowing that at this juncture, *see Hemphill v. Barnhart*, No. 01 C 6556, 2002 WL 1613721, at *8 (N.D. Ill. July 18, 2002) ("[N]o court should be forced to engage in speculation as to the reasons for an ALJ's decision." (citations omitted)), and the VE clearly stated that there would be no work for a hypothetical individual with all of the limitations that Steininger claimed, one of which was a "limited ability to concentrate." (Tr. 521); *see Kasarsky*, 335 F.3d at 544.

Furthermore, in this instance the hypothetical that the ALJ posed to the VE specifically stated that the hypothetical individual "would need a sit/stand option where the individual could sit occasionally throughout an eight-hour workday, *but still pay attention to the task at hand*, and also would be limited to simple, routine repetitive tasks and only occasional and brief interactions with others, but would work best alone." (Tr. 518 (emphasis added).) This particular language by the ALJ – that is, his inclusion of the phrase "but still pay attention to the task at hand" – creates doubt as to whether the ALJ's finding of moderate deficits in concentration, persistence, or pace was adequately depicted in the hypothetical.

Consequently, this case will be remanded to the Commissioner so that the ALJ may properly incorporate all of the limitations that he articulated in his step three finding into his analysis at step five.[5] *See Kasarsky*, 335 F.3d at 544.

---

[5] Steininger also contends that his waiver of the right to counsel was invalid and that the ALJ failed to fully and fairly develop the record. Because a remand is warranted on Steininger's first argument, we do not need to reach this remaining argument and will address it only summarily.

To ensure a valid waiver, the ALJ must explain to a *pro se* claimant "(1) the manner in which an attorney can aid in the proceedings, (2) the possibility of free counsel or a contingency arrangement, and (3) the limitation on attorney fees to 25 percent of past due benefits and required court approval of fees." *Binion v. Shalala*, 13 F.3d 243,

12

## VI.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion.  The Clerk is directed to enter a judgment in favor of Steininger and against the Commissioner.

SO ORDERED.

Enter for this 7th day of October, 2008.

S/Roger B. Cosbey<br>
Roger B. Cosbey,<br>
United States Magistrate Judge

---

245 (7th Cir. 1994); *Thompson v. Sullivan*, 933 F.2d 581, 584 (7th Cir. 1991).  At the hearing, the ALJ thoroughly explained to Steininger his right to representation and the possibility of free counsel, reminding him that enclosures were sent to him with the notice of hearing explaining his right to such representation. (Tr. 465-66.)  The ALJ, however, did not explain the limitation on attorney fees to 25 percent of past due benefits and required court approval of fees, and the enclosures to which the ALJ referred at the hearing do not appear to be in the record. (*See* Tr. 28-32.)  Therefore, on this record we cannot definitively ascertain whether Steininger's waiver of counsel was valid.

If the ALJ does not obtain a valid waiver, the burden shifts to the Commissioner to show that the ALJ adequately developed the record. *Binion*, 13 F.3d at 245 ("Without the shifting of this burden, no sanction would exist for an ALJ's inadequate explanation of a claimant's rights."); *see also Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007).  To adequately develop the record when a claimant is unrepresented, the ALJ must "scrupulously and conscientiously . . . probe into, inquire of and explore for all the relevant facts . . . ." *Binion*, 13 F.3d at 245; *see also Skinner*, 478 F.3d at 841-42; *Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997).  Here, Steininger stated at the hearing that he was treated by Dr. Pancer, a psychiatrist, yet the ALJ did not probe into Steininger's treating relationship with Dr. Pancer or request Dr. Pancer's records. (*See* Tr. 21, 24-25, 447, 497-99.)  Since we cannot definitively discern the validity of Steininger's waiver of counsel, upon remand the ALJ is encouraged to consider seeking Dr. Pancer's records in order to complete the record.